# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

VIVIANE PTAK, *as a personal representative of the Estate of Philip Paul Castonguay, III*,

    *Plaintiff*,

    v.

JEANNE VAN PATTEN-STEIGER; THE TOWN OF MILFORD; THE MILFORD POLICE DEPARTMENT; JOSEPH FRANCESCONI; ELIAS GIOKAS; KARA MAGUIRE; TODD FLETCHER; MICHAEL PIGHETTI,

    *Defendants*.

Civ. No.: 4:23-cv-11423-MRG

## MEMORANDUM AND ORDER

**GUZMAN, J.**

This case arises from tragic circumstances. On the evening of April 5, 2020, Milford Police Department ("MPD") Officer Jeanne Van-Patten-Steiger ("Officer Van-Patten") shot and killed 39-year-old Philip Paul Castonguay III ("Mr. Castonguay") outside of his apartment in Milford, Massachusetts. At the time of the incident, Mr. Castonguay was experiencing a mental health crisis. Mr. Castonguay's mother, Viviane Ptak ("Plaintiff"), brought this action against the Town of Milford, MPD, and several MPD officers[1] (collectively, "Defendants"), asserting claims under 42 U.S.C. § 1983 and Massachusetts common law. Plaintiff alleges violations of the Fourth and

---

[1] The MPD officers include Defendants Joseph Francesconi, Elias Giokas, Kara Maguire, Todd Fletcher, and Michael Pighetti. [ECF No. 1-2 ¶¶ 17–22].

1

Fourteenth Amendments, as well as claims for assault and battery, wrongful death, and intentional and negligent infliction of emotional distress.

Defendants have moved for summary judgment, principally on the ground of qualified immunity. For the reasons explained below, the Court **GRANTS** Defendants' motion. In reaching this conclusion, the Court does not—and cannot—minimize the loss of life at the heart of this case. Rather, the outcome reflects only an application of the governing qualified immunity doctrine, after viewing the facts in the light most favorable to the Plaintiff.

## I.    LOCAL RULE 56.1.

The Court first addresses Local Rule 56.1. Under Local Rule 56.1,[2] facts set forth in Defendants' Statement of Material Facts ("DSOF"), [ECF No. 34], not specifically controverted by Plaintiff's Statement of Material Facts ("PSOF"), [ECF No. 38], are deemed admitted for purposes of this motion. The First Circuit and courts in this District consistently interpret Local Rule 56.1 to deem admitted facts that are not specifically controverted.[3] The Court therefore treats

---

[2] Local Rule 56.1 is "designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.'" Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (quoting Calvi v. Knox Cnty., 470 F.3d 422, 427 (1st Cir. 2006)). It provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried," and that "[a] party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1. The factual allegations in a movant's statement of facts "will be deemed . . . admitted by opposing parties unless controverted by the statement required to be served by opposing parties." Id.

[3] See, e.g., Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (deeming admitted a statement of undisputed material facts that was not controverted by opposing party); Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest date in statement of material facts caused date to be admitted); Plourde v. Sorin Grp. USA, Inc., 517 F. Supp. 3d 76, 81 (D. Mass. 2021) ("When a party opposing summary judgment fails to dispute the facts presented by the moving party, those facts are deemed admitted."); Isaac v. Exec. Off. of Health & Hum. Servs., No. 22-11745-RGS, 2023 WL 8544987, at *1 n.2 (D. Mass. Dec. 11, 2023) ("deem[ing] as admitted all . . . factual assertions in defendants' [statement of facts]" unchallenged

as admitted any properly supported factual assertion in the DSOF that Plaintiff does not specifically controvert with record citations.

## II.   FACTUAL BACKGROUND[4]

At the time of the incident, Mr. Castonguay lived on the third floor of a three-unit residential building located at 32 Glines Avenue in Milford, Massachusetts. On April 5, 2020, Officer Van-Patten was dispatched to Mr. Castonguay's address twice. She was first dispatched in response to a neighbor's report that Mr. Castonguay dropped a cement birdbath from his third-floor porch through the sunroof of the neighbor's car. Later in her patrol shift, Officer Van-Patten was called back in response to a report that Mr. Castonguay was threatening a neighbor with a bat. The second call culminated in Mr. Castonguay's death.

### A.  The First Call: The Cement Birdbath Incident

On the afternoon of April 5, 2020, Mr. Castonguay's first-floor neighbor contacted the police to report that Mr. Castonguay had dropped a cement birdbath through the sunroof of his car from the third-floor porch. [PSOF ¶¶ 1–3]. Officer Van-Patten was dispatched. Upon arrival, she observed substantial damage to the neighbor's Nissan Maxima that was parked in the rear lot at 32 Glines Avenue. [ECF No. 38-2 at 3]. Officer Van-Patten reported that the "sunroof was completely shattered, the roof was crushed, the windshield was spidered, and there was a cement birdbath pedestal in the passenger seat." [Id.]

---

by plaintiff); Brown v. Bussone, No. 12-10338-LTS, 2013 WL 1629081, at *1 n.3 (D. Mass. Apr. 10, 2013) (same).

[4] The facts described in this section are undisputed unless otherwise noted. The Court derives the facts from the admitted portions of the parties' statements of material facts and the Court's own review of the record and determination of what facts are material. [DSOF; PSOF]. If a party admitted a fact in part, the Court includes the substance of the undisputed part. The Court excludes facts, or parts of facts, that are legal conclusions, immaterial, inadmissible at trial, or not supported by a citation to record evidence.

Officer Van-Patten also "note[d] in her report that she had prior dealings with [Mr. Castonguay] at that address and was aware of his mental health struggles and a prior civil commitment." [PSOF ¶ 4].[5] Although she took a report—"primarily for insurance purposes"—she did not attempt to speak with Mr. Castonguay before leaving the scene. [Id. ¶¶ 4–5]. Officer Van-Patten explained that decision by noting that the incident occurred during the COVID-19 pandemic and that she already possessed sufficient information for the neighbor to pursue an insurance claim. [ECF No. 38-2 at 4]. Plaintiff emphasizes that Officer Van-Patten did not attempt to speak with Mr. Castonguay and lacked probable cause to arrest him at that time. [PSOF ¶¶ 4–5]. Plaintiff does not, however, dispute the reasonableness of the neighbor's belief that Mr. Castonguay was responsible for the damage to the vehicle.

### B. The Second Call: Mr. Castonguay Threatens Neighbors with a Bat

#### 1. Officer Van-Patten is dispatched to 33 Glines Avenue.

Later in her patrol shift, Officer Van-Patten was dispatched to 33 Glines Avenue "for a disturbance involving a gentleman who lived across the street at 32 Glines Avenue, who was threatening them and their vehicles with a weapon." [DSOF ¶ 1; PSOF ¶¶ 6–7]. That gentleman was Mr. Castonguay. [PSOF ¶ 6]. John Alves,[6] a 33 Glines Avenue resident, called the police after Mr. Castonguay allegedly "c[a]me onto his property holding a bat in a menacing way" as he "was putting out his trash barrels." [Id. ¶ 7].

---

[5] In her PSOF, Plaintiff cites pages 88–92 of Officer Van-Patten's deposition to support this assertion. While the cited portion of the transcript does not clearly support the factual assertion, other record evidence does. See, e.g., Van-Patten Dep. 85–86:19–6; ECF No. 38-3 at 3.

[6] The Court notes that it is possible that Mr. Alves's wife, Maria Alves, contacted the police to report the incident. [See ECF No. 1-2 ¶ 86]. Whether Mr. Alves or Ms. Alves called does not change the Court's summary judgment analysis or conclusion.

### 2. *Officer Van-Patten arrives at 33 Glines Avenue.*

At approximately eight in the evening, Officer Van-Patten arrived at 33 Glines Avenue. [PSOF ¶¶ 6–8; ECF No. 38-2 at 4]. Officer Van-Patten parked her patrol car in front of Mr. Castonguay's apartment building. [PSOF ¶ 8; ECF No. 38-3 at 4]. She then approached a group of five 33 Glines Avenue residents gathered across the street from Mr. Castonguay's apartment. [Id.] The group—Peter and Stephanie Duquette, John and Maria Alves, and an unidentified man—told "Officer [Van-Patten] that [Mr. Castonguay] had mental health issues." [PSOF ¶ 12; Peter Duquette Aff. ¶¶ 5–8, ECF No. 38-3; Stephanie Duquette Aff. ¶¶ 2–4, ECF No. 38-4].

Mr. Alves told Officer Van-Patten that, prior to her arrival, Mr. Castonguay was threatening neighbors and their vehicles with a bat. [Van-Patten Dep. 96:11–14, ECF No. 35-1 ("[A]fter I got on scene, Mr. Alves did tell me that there was a bat, and that's what he was threatening the neighbors and the trucks with."); PSOF ¶ 7].

After speaking with the group of neighbors, "[Officer Van-Patten] called for rescue and backups because," she reasoned, "this was the second time she had responded to Glines Avenue that day" for an incident she attributed to Mr. Castonguay and was "[c]oncerned that there might be a mental health situation." [DSOF ¶ 3; PSOF ¶¶ 9–12]. She therefore decided to "Section 12" Mr. Castonguay—that is, to detain him for involuntary hospitalization and psychiatric evaluation based on the perceived risk of harm he posed to himself and others.[7] [DSOF ¶ 3; PSOF ¶¶ 9–10]. Officer Van-Patten testified that it was her standard practice to wait for emergency medical

---

[7] The Massachusetts statute, MASS. GEN. LAWS ch. 123, § 12(a), provides: "In an emergency situation, if a physician, qualified psychologist, qualified advanced practice registered nurse or licensed independent clinical social worker is not available, a police officer who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person for a 3-day period at a public facility or a private facility authorized for such purpose by the department."

services and "a couple of other units" before approaching and detaining an individual for a Section 12 hold. [Van-Patten Dep. 100:21–23].

After deciding to proceed with a Section 12 hold, Officer Van-Patten continued to wait with the group of neighbors across the street from Mr. Castonguay's apartment for backup and emergency medical personnel to assist. [DSOF ¶¶ 3–6; PSOF ¶¶ 10–11]. Two officers informed Officer Van-Patten that they would arrive shortly and "[d]ispatch indicated that fire and rescue were also being dispatched for a Section 12 stage." [DSOF ¶¶ 4–5; PSOF ¶ 10]. Officer Van-Patten had no intention of initiating contact with or detaining Mr. Castonguay before backup arrived. [DSOF ¶¶ 3–6; PSOF ¶¶ 10–11; Van-Patten Dep. 100:21–23].

### 3. *Mr. Castonguay appears while Officer Van-Patten is waiting for backup*

While waiting for backup to arrive, a motion-activated floodlight at 32 Glines Avenue—Mr. Castonguay's address—turned on. [DSOF ¶ 6; PSOF ¶ 13; Van-Patten Dep. 100:11–15]. The neighbors "reported to Officer Van-Patten[] that [Mr. Castonguay] was approaching." [DSOF ¶ 7; Van-Patten Dep. 101:10–14]. This occurred a couple of minutes after Officer Van-Patten arrived. [Stephanie Duquette Aff. ¶ 5]. One of the neighbors who was standing with Officer Van-Patten, Stephanie Duquette, testified that—at the moment that the floodlight came on—she "saw [Mr. Castonguay] moving towards [the group] with something raised over his head." [Stephanie Duquette Aff. ¶ 6]. At that point, Mr. Castonguay—who exited his third-floor apartment from the back staircase and made his way to the front driveway—was approximately fifty feet from the group. [Id.; Peter Duquette Aff. ¶ 7; ECF No. 1 ¶ 91]. The distance between the group and Mr. Castonguay began to close as he approached. [Stephanie Duquette Aff. ¶ 6; DSOF ¶ 7; Peter Duquette Aff. ¶ 7]. Officer Van-Patten recalls Ms. Duquette saying: "oh, here he comes," or a

6

variation thereof, as Mr. Castonguay advanced in the group's direction. [Van-Patten Dep. 101:10–14].

### 4. Officer Van-Patten crosses the street and approaches Mr. Castonguay

Placing herself between the five bystanders and Mr. Castonguay, who was approaching with a metal object in his hand, Officer Van-Patten walked across the street towards Mr. Castonguay "while shining her police-issued flashlight directly in his face." [PSOF ¶ 14; DSOF ¶ 8]. Officer Van-Patten was in "her full standard issue uniform, which included her tactical vest, belt, handcuffs, and firearm." [DSOF ¶ 2; Van-Patten Dep. 106:2–7 ("I was wearing a navy blue police uniform with Milford Police on the back and a badge on the front . . . a police radio, my duty belt, and . . . modern nylon police pants.")]. After crossing the street, Officer Van-Patten began walking up the driveway of Mr. Castonguay's apartment building—which was still illuminated by the floodlight—towards Mr. Castonguay. [DSOF ¶ 8; PSOF ¶¶ 13–14]. She could see that Mr. Castonguay "was a disheveled, thin, white male [whose] pants were covered in urine." [PSOF ¶ 18]. At that point, neither the emergency medical personnel nor backup officers had arrived. [Peter Duquette Aff. ¶ 7]. Officer Van-Patten was the sole law enforcement officer on scene with the five bystanders.

## C. Officer Van-Patten Fatally Shoots Mr. Castonguay

### 1. Dispute Regarding Officer Van-Patten's Perception

The parties dispute what occurred next as Mr. Castonguay approached Officer Van-Patten. Officer Van-Patten asserts that Mr. Castonguay reached in his waistband for what appeared to be a black pistol grip as he approached. [DSOF ¶ 10]. Plaintiff contends that Mr. Castonguay instead held a metal object raised above his head without reaching for his waistband. [PSOF ¶ 17]. Plaintiff argues that Officer Van-Patten's account is "contrary to the independent evidence," [Pl.'s Mem.

7

in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") ECF No. 39 at 9], which consists of the Worcester County District Attorney's Report ("DA's Report"), ECF No. 38-5, and the sworn affidavits of Peter and Stephanie Duquette. [ECF Nos. 38-3 & 38-4]. At summary judgment, the Court considers the sworn affidavits[8] but does not rely on the DA's Report.[9]

Although a factual dispute at what appears to be a pivotal moment exists between Plaintiff's version of events (supported by the affidavits) and Officer Van-Patten's account, the differences are immaterial. Whether Mr. Castonguay reached for a firearm or held a metal object above his head, Officer Van-Patten's use of force was objectively reasonable under the Fourth Amendment. Viewing the record in the light most favorable to Plaintiff and drawing all reasonable

---

[8] Affiants Peter and Stephanie Duquette witnessed the incident from directly across the street and made their affidavits (submitted by Plaintiff) based on their personal, firsthand knowledge. This satisfies Fed. R. Civ. P. 56(c)(4). Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) (citing Cadle Co. v. Hayes, 116 F.3d 957, 961 n. 5 (1st Cir.1997)) ("[A] 'party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.'"); 10A Wright & Miller, *Federal Practice & Procedure* § 2727 (3d ed. 2011) ("facts asserted by the party opposing the [summary judgment] motion, if supported by affidavits or other evidentiary materials, are regarded as true.").

[9] The Court cannot consider factual conclusions embedded within the DA's Report for the truth of the matters asserted. The authors of the Report were not present during the incident, and its factual conclusions are derived from reports and testimony of individuals with firsthand knowledge. Any factual findings in the DA's Report that rely on statements of third parties therefore constitute inadmissible hearsay. The public records exceptions to hearsay—including Fed. R. Evid. 803(8)(A)(iii)—do not alter this conclusion. See United States v. Mackey, 117 F.3d 24, 28 (1st Cir. 1997) ("hearsay statements by third persons . . . are not admissible under this exception merely because they appear within public records"); Davila v. Corporacion de P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007) (citations omitted) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment."); Est. of Rahim by Rahim v. United States, 506 F. Supp. 3d 104, 112–13 (D. Mass. 2020), rev'd on other grounds, Est. of Rahim by Rahim v. Doe, 51 F.4th 402 (1st Cir. 2022) (quoting Mackey, 117 F.3d at 28) ("Insofar as the District Attorney's Report . . . is not based on first-hand observations . . . and to the extent that it is offered to indirectly prove facts asserted by the individuals with first-hand knowledge of the incident, those underlying statements amount to 'hearsay statements by third persons' which 'are not admissible . . . merely because they appear within public records.'").

inferences in her favor, the Court assumes that Mr. Castonguay held a metal object above his head rather than reaching for a firearm, consistent with the affidavits submitted by the Plaintiff. [ECF Nos. 38-3 & 38-4]. Under this assumed version of events, the Court need not weigh evidence or make credibility determinations to conclude Defendants are entitled to summary judgment as a matter of law. See Town of Westport v. Monsanto Co., 877 F.3d 58, 66 (1st Cir. 2017) ("[I]t is well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage"). As discussed below, because the outcome of this case is the same under either version of events, the Court proceeds with the version of events proffered by Plaintiff.[10]

### 2. *The Shooting*

Proceeding under Plaintiff's version of events, the Court recounts the seconds leading up to the shooting. As Officer Van-Patten, in full uniform and shining her flashlight, approached Mr. Castonguay in his driveway, she attempted to engage him in conversation.[11] She asked: "How are you?" or "What's going on?" [PSOF ¶ 14; DSOF ¶ 9].[12] Mr. Castonguay did not respond. [Peter Duquette Aff. ¶ 8]. Instead, he began walking more quickly towards Officer Van-Patten. [Peter Duquette Aff. ¶ 8; Stephanie Duquette Aff. ¶ 8; DSOF ¶ 13]. Both Mr. and Ms. Duquette observed

---

[10] The Court is mindful that "history is usually written by those who survive to tell the tale." Flythe v. D.C., 791 F.3d 13, 19 (D.C. Cir. 2015). This concern is particularly salient in police shooting cases, where "the witness most likely to contradict [the officer's] story—the person . . . shot dead—is unable to testify." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). Here, however, the presence of two independent eyewitnesses who properly submitted affidavits allows the Court to evaluate the facts without relying solely on the officer's account. The Court therefore does not confront the situation—often present in excessive-force cases—where the only firsthand account of the incident comes from the officer who used deadly force.

[11] Plaintiff emphasizes that Officer Van-Patten did not identify herself as a police officer. [PSOF ¶ 20].

[12] Officer Van-Patten testified that she said: "something along the lines [of], 'hey, what's going on, or hey.'" [Van-Patten Dep. 103:5–9].

something in Mr. Castonguay's hands the entire time as he advanced on Officer Van-Patten. Ms. Duquette observed that Mr. Castonguay "was walking [towards the group] with a purpose, had an unknown object in his hands, and his hands were raised above his head." [Stephanie Duquette Aff. ¶ 7]. The object "extended[ed] past [Mr. Castonguay's] hand" and appeared to be white. [Id. ¶ 9]. Mr. Castonguay "raised [the object] quickly above his head, as if in a manner to come down hard with it." [Peter Duquette Aff. ¶ 10]. "Once [Mr. Castonguay] got within 15 to 20 [feet of Officer Van-Patten], he raised one of his arms" while holding an object in his hands. [Peter Duquette Aff. ¶ 9]. With Mr. Castonguay within ten feet of her, Officer Van-Patten discharged her service weapon, fatally wounding him. [PSOF ¶ 23]. "Less than four to five seconds elapsed between" Officer Van-Patten verbally addressing Mr. Castonguay after crossing the street and the shooting. [PSOF ¶ 22]. Mr. Duquette noted that "it couldn't have been more than 15 seconds" from the time he first saw Mr. Castonguay (*while Officer Van-Patten was still across the street with the five bystanders*) until he was shot. [Peter Duquette Aff. ¶ 14]. After the shooting, it was determined that the object in Mr. Castonguay's hand was a "black and white metal pipe." [PSOF ¶ 25].

The Court notes that only one of the affiants reported hearing Officer Van-Patten twice instruct Mr. Castonguay to stop approaching before the shooting. [Stephanie Duquette Aff. ¶ 8 ("The officer told the deceased to stop, but he kept coming and did not slow down. The Officer told him to stop again, and he did not stop."); id. at 12 ("The Officer shot the deceased after twice telling him to stop."). Because the Court must draw all reasonable inferences in Plaintiff's favor, it declines to rely on this testimony as it would strengthen Defendants' position where the record permits a contrary inference. See Casas Office Machines, Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

10

Therefore, testimony regarding the "stop" commands, although uncontradicted, will not be considered.

## III.    PROCEDURAL HISTORY

Plaintiff filed a complaint on April 3, 2023 in Worcester Superior Court. [Complaint ("Compl."), ECF No. 1-2]. On June 26, 2023, the action was removed to this Court. [ECF No. 1]. Defendants filed their motion for summary judgment on April 3, 2025, along with a statement of material facts and a memorandum in support. [ECF Nos. 32–35]. Plaintiff subsequently filed her opposition brief, accompanied by her responses to Defendants' statements of material facts. [ECF Nos. 38–39]. The Court heard oral argument on the present motion for summary judgment on August 25, 2025. [ECF No. 43]. Against this factual and procedural backdrop, the Court turns to the legal standards governing summary judgment.

## IV.    LEGAL STANDARDS

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant" but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" Dixon-Tribou v. McDonough, 86 F.4th 453, 458 (1st Cir. 2023) (quoting Lahens v.

11

AT&T Mobility P.R., Inc., 28 F.4th 325, 333 (1st Cir. 2022)). The nonmoving party cannot "rest upon mere allegation or denials," but must instead "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–57 (1986).

Ultimately, the Court must distinguish which facts are truly material and consider whether—in the face of undisputed material facts—legal standards constrain Plaintiff's claims such that the Defendants are entitled to judgment as a matter of law. See Triumph Foods, LLC v. Campbell, 742 F. Supp. 3d 63, 69 (D. Mass. 2024) (citing id. at 248).

The Court is mindful that deciding qualified immunity at the summary judgment stage may present challenges. Indeed, because qualified immunity is an immunity from suit, it is "effectively lost" if permitted to proceed to trial. Pearson v. Callahan, 555 U.S. 223, 231 (2009). As such, the application of the doctrine should be resolved at the earliest stage of litigation, which typically occurs on a motion for summary judgment. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). The intersection of qualified immunity principles and summary judgment principles may present "thorny analytic[al] problems," including "a tug-of-war . . . between who gets the benefit of the doubt: summary judgment requires absolute deference to the nonmovant's factual assertions, while qualified immunity demands deference to the reasonable, if mistaken, actions of the movant." Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (citation modified). Therefore, the Court must "identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Penate v. Sullivan, 73 F.4th 10, 17 (1st Cir. 2023) (quoting Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009)).

## V.    DISCUSSION

### A.  Count I (Excessive Use of Force Claim Against Officer Van-Patten)

In Count I, pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff asserts that Officer Van-Patten's use of deadly force against Mr. Castonguay violated the Fourth Amendment. [Compl. ¶¶ 216–31]. Officer Van-Patten argues that her use of force was objectively reasonable under the circumstances and that she is entitled to qualified immunity. [Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") ECF No. 33 at 3-6].

### 1.  The Qualified Immunity Doctrine.

The doctrine of qualified immunity often presents a substantial obstacle for plaintiffs seeking money damages from state officials, including police officers, for alleged violations of constitutional rights.[13] Although Section 1983 provides a federal cause of action for constitutional violations by state officials, those officials are shielded from liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curiam) (quoting White v. Pauly, 580 U.S. 73, 78–79 (2017) (per curiam)). "The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, 'from an objective standpoint, should have known that their conduct was unlawful.'" Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014)); see also Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (it protects "all but the plainly incompetent or those who knowingly violate

---

[13] Knight v. Mills, 836 F.2d 659, 665 (1st Cir. 1987) (quoting Note, Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation, 95 YALE L.J. 126, 127–28 (1985)) ("The potential for recovery of damages in civil rights litigation involving government officials has been severely curtailed by the law of qualified immunity, which evolved to protect 'officials from liability for constitutional violations in all but the most egregious cases.'").

the law"); Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 22 (1st Cir. 2016) (citing Taylor v. Barkes, 575 U.S. 822, 824 (2015)) (it "protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess").[14]

An officer is entitled to qualified immunity "unless (1) [the officer] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the officer's] conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 583 U.S. 48, 62–63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "The prongs need not be addressed in order, and an officer may be entitled to immunity based on either prong." Estate of Rahim ex rel. Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022) (citation omitted).

The Court first addresses whether Officer Van-Patten violated a constitutional right.

### a.  Whether Plaintiff Demonstrates a Violation of a Constitutional Right

Where, as here, the claim arises from a police officer's use of deadly force, the alleged violation is analyzed under the Fourth Amendment's prohibition against unreasonable seizures. McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017) (citing Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003) (per curiam) ("[a] police officer's use of deadly force is deemed a seizure under the Fourth Amendment")). "A police officer's use of deadly force violates the Fourth Amendment when it is not 'objectively reasonable.'" Barnes v. Felix, 605 U.S. 73, 76 (2025) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Therefore, the dispositive question here is whether Officer Van-Patten's use of force against Mr. Castonguay was objectively reasonable. McKenney, 873 F.3d at 81.

---

[14] The doctrine seeks to "balance[] . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from . . . liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The First Circuit has observed that the doctrine endeavors to "protect law enforcement from the chilling threat of liability." Swain v. Spinney, 117 F.3d 1, 10 (1st Cir. 1997).

This analysis is not easy. "Reasonableness" is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 19 (1968)). The "inquiry into reasonableness . . . requires assessing the 'totality of the circumstances.'" Barnes, 605 U.S. at 76 (quoting Graham, 490 U.S. at 396). To avoid "viewing the events through the distorted prism of hindsight," the analysis must also account for the "fast-breaking and potentially life-threatening circumstances" faced by the officer on the ground. United States v. Giambro, 126 F.4th 46, 70 (1st Cir. 2025) (Lynch, J., dissenting) (quoting 79 C.J.S. Searches § 79 (2024)).[15]

Additionally, the objective-reasonableness inquiry requires courts to concentrate on the information known to the officer when the force was deployed, not what was discovered to be true *after* the incident. Tennessee v. Garner, 471 U.S. 1, 11 (1985) (concluding that the reasonableness of deadly force depends on what an "officer had probable cause to believe"); Barnes, 605 U.S. at 80 (quoting Graham, 490 U.S. at 396) ("[D]eciding whether a use of force was objectively reasonable demands 'careful attention to the facts and circumstances' relating to the incident, *as then known to the officer*." (emphasis added)). The question is therefore what Officer Van-Patten knew at the time and whether a reasonable officer possessing the same information would have used deadly force.

---

[15] In this deeply tragic and life-altering case, it is not lost on the Court that it is rendering judgment from "the peace of a judge's chambers," Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973), and that it may not discount "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397; see also Barnes, 605 U.S. at 89–90 (Kavanaugh, J. concurring) ("In analyzing the reasonableness of an officer's conduct[,] . . . courts must appreciate the extraordinary dangers and risks facing police officers and the community at large.").

Finally, it is axiomatic that the analysis may not be confined to the split-second when force was deployed. The Court must consider the totality of the circumstances, including all events leading up to the moment of the shooting. Barnes, 605 U.S. at 80 (although "the situation at the precise time of the shooting will often be what matters most . . . earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones"). This is because the "history of the interaction, as well as other past circumstances known to the officer . . . may inform the reasonableness of the use of force." Id. at 80–81.

Although there is no "easy-to-apply legal test," courts consider a non-exhaustive set of factors when evaluating the reasonableness of an officer's use of deadly force. Barnes, 605 U.S. at 80 (quoting Scott v. Harris, 550 U.S. 372, 382 (2007)). After surveying the "case law concerning the reasonableness of officers' use of force," the First Circuit identified several "relevant" factors, Est. of Rahim, 51 F.4th at 413 (1st Cir. 2022), including:

> [1] whether a reasonable officer on the scene could believe that the suspect posed an immediate threat to police officers or civilians, [2] whether a warning was given before the use of force and whether the suspect complied with this command, [3] whether the suspect was armed . . . at the time of the encounter or whether the officers believed the suspect to be armed, [4] the speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force, [5] whether the suspect was advancing on the officers or otherwise escalating the situation, [6] the suspect's physical proximity to the officers at the time of the use of force . . . , [7] whether multiple officers simultaneously reached the conclusion that a use of force was required, and [8] the nature of the underlying crime.

Huffman v. City of Bos., No. 21-CV-10986-ADB, 2025 WL 2778035, at *5 (D. Mass. Sept. 29, 2025) (quoting Bannon v. Godin, 99 F.4th 63, 78 (1st Cir. 2024)). The first factor is often the most important. Vos v. City of Newport Beach, 892 F.3d 1024, 1031–32 (9th Cir. 2018) ("The most important factor . . . is whether [the suspect] posed an immediate threat to the safety of officers or others."); Conlogue v. Hamilton, 906 F.3d 150, 159 (1st Cir. 2018) (concluding that qualified

16

immunity applied when an "armed individual took actions that placed officers at imminent risk of serious bodily harm"). As applied here, the relevant factors weigh in Officer Van-Patten's favor.

### 1. Factor One: No reasonable jury could conclude that Mr. Castonguay did not pose an immediate threat.

The Court first considers what Officer Van-Patten knew before deploying lethal force. Accepting Plaintiff's version of the facts and drawing all reasonable inferences in her favor, Officer Van-Patten knew the following before fatally shooting Mr. Castonguay on the evening of April 5, 2020:

- She was aware of Mr. Castonguay's "mental health struggles and a prior civil commitment." [PSOF ¶ 4].

- She knew that a neighbor reported that Mr. Castonguay dropped a cement birdbath from his third-floor porch through the sunroof of his neighbor's car earlier in the day, causing substantial damage. [PSOF ¶¶ 1–2].

- She knew that a neighbor reported that Mr. Castonguay had threatened him with a bat earlier that evening. [PSOF ¶¶ 6–7].

- She knew, moments before she fired at him, Mr. Castonguay "was a disheveled, thin, white male [whose] pants were covered in urine." [PSOF ¶ 18].

- She knew that she was the only officer on the scene when Mr. Castonguay began walking towards her and the five bystanders. [Peter Duquette Aff. ¶ 7].

- She knew that Mr. Castonguay, who was approaching her with a metal object held above his head, did not respond after attempting to engage him in conversation. [PSOF ¶¶ 14, 16; DSOF ¶ 9].

- She knew that Mr. Castonguay, without speaking, began approaching her in the driveway with the metal object in his hands. [Peter Duquette Aff. ¶ 8; Stephanie Duquette Aff. ¶ 8; DSOF ¶ 13].

- She knew that Mr. Castonguay "was walking [towards the bystanders] with a purpose," [Stephanie Duquette Aff. ¶ 7], and, when he was within fifteen to twenty feet of her, he "raised [the metal object] quickly above his head, as if in a manner to come down hard with it." [Peter Duquette Aff. ¶¶ 9–10].

Officer Van-Patten fatally shot Mr. Castonguay when he came within ten feet of her. [PSOF ¶ 23]. The Court concludes that a reasonable officer possessing the same information would have probable cause to believe that Mr. Castonguay posed a dangerous threat justifying the use of lethal force under the same circumstances. Garner, 471 U.S. at 11; Barnes, 605 U.S. at 80 (quoting Graham, 490 U.S. at 396). Officer Van-Patten—the only officer on scene and responsible for the safety of five bystanders—was confronted with a man who she reasonably believed to be volatile and potentially violent, who was silently advancing towards her while holding a metal object raised above his head in a threatening manner. The entire encounter unfolded in a matter of seconds. Under these facts, no reasonable jury could conclude that a reasonable officer would not have perceived an immediate threat. Garner, 471 U.S. at 3. The Fourth Amendment does not require officers to wait until the perceived threat is realized. Conlogue v. Hamilton, No. 1:16-CV-296-GZS, 2017 WL 5339895, at *12 (D. Me. Nov. 13, 2017), aff'd, 906 F.3d 150 (1st Cir. 2018) (quoting Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007)) ("It is well established that 'the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'"). Accordingly, the first factor weighs in Officer Van-Patten's favor.

### 2. *The Remaining Factors Do Not Defeat Qualified Immunity*

The remaining factors identified by the First Circuit do not defeat qualified immunity. Viewing the record in the light most favorable to Plaintiff, the Court addresses each in turn.

*Warning*: Officer Van-Patten did not warn Mr. Castonguay that she would use deadly force if he continued to advance towards her with the metal object in his hands. But that does not alter the outcome. The Supreme Court has clarified that officers need only give a warning if feasible. Garner, 471 U.S. 1, 11–12 (officer should provide a warning "where feasible"). Courts in this district have declined to fashion an inflexible rule requiring officers to warn suspects before using

18

deadly force. St. Hilaire v. City of Laconia, 885 F. Supp. 349, 357 (D.N.H.), aff'd, 71 F.3d 20 (1st Cir. 1995) (finding police officers who did not provide a warning before fatally shooting decedent were entitled to qualified immunity because "no warning was feasible in the split-second between when [the officer] believed [the decedent] was about to shoot him and he acted in self-defense."); Medeiros v. Town of Dracut, 21 F. Supp. 2d 82, 88 (D. Mass. 1998) (no warning required when not feasible). Here, a warning was not feasible. Within a span of approximately five seconds, unresponsive to her attempt to verbally engage him, Mr. Castonguay advanced towards Officer Van-Patten with a weapon and, within fifteen feet of her, raised it in a manner indicating an intent to inflict harm. Under these facts, a jury would not view a warning as a prerequisite for a finding of qualified immunity. Reich v. City of Elizabethtown, Kentucky, 945 F.3d 968, 982 (6th Cir. 2019) ("There is no rule that officers must wait until a suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force.") [16]

*Weapon*. Mr. Castonguay was armed with a metal pipe. This too does not change the outcome. Federal courts have long recognized that "[t]he determination whether an object constitutes a 'dangerous weapon' turns not on the object's latent capability alone, but also on the manner in which the object was used." United States v. Gholston, 932 F.2d 904, 904 (11th Cir.

---

[16] Officer Van-Patten did not need to wait until she was in striking distance. Est. of Ceballos v. Husk, 919 F.3d 1204, 1231 (10th Cir. 2019) (noting that courts have found a distance of "12 and 20 feet" between an officer and suspect "sufficient to create an immediate threat to officers" justifying the use of lethal force); Ventura v. Rutledge, 978 F.3d 1088 (9th Cir. 2020) (officer entitled to qualified immunity where the officer shot a suspect who was 10-15 feet away); Buchanan v. City of San Jose, 782 F. App'x 589 (9th Cir. 2019) (officers entitled to qualified immunity when they shot a man who was 55 feet away and advancing toward the officers); Mercado v. Ogden City, No. 120-cv-00090, 2024 WL 757265, at *14 (D. Utah Feb. 23, 2024) (Est. of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1262 (10th Cir. 2008)) ("In assessing the objective reasonableness of deadly force, there is no 'bright line rule[]' about distance between an officer and suspect.").

19

1991) (quoting United States v. Guilbert, 692 F.2d 1340, 1343 (11th Cir. 1982)).[17] The record would permit a reasonable officer to conclude that Mr. Castonguay was using—or was imminently intending to use—the metal pipe in a dangerous and threatening manner. In the words of one of Plaintiff's affiants, as Mr. Castonguay closed in on Officer Van-Patten, he "raised [the metal object] quickly above his head, as if in a manner to come down hard with it." [Peter Duquette Aff. ¶¶ 9–10].

The remaining factors also weigh in Officer Van-Patten's favor. As discussed above, Officer Van-Patten was faced with seconds—not minutes—to respond to the perceived threat; Mr. Castonguay was advancing towards her and picking up speed as he closed in; Mr. Castonguay was within ten feet of Officer Van-Patten when she shot him; and she was responding to a report that Mr. Castonguay was threatening a neighbor with a weapon after an earlier report that he dropped a cement birdbath three stories into a neighbor's car.[18] See supra Section II. Therefore, the First Circuit "reasonableness" factors tip in Officer Van-Patten's favor, and the Court concludes that Officer Van-Patten's use of deadly force was objectively reasonable under the circumstances as a matter of law.

---

[17] See also Winkley v. Hancock Cnty., Mississippi, 730 F. Supp. 3d 296, 302 (S.D. Miss. 2024), aff'd sub nom. Winkley v. Blackwell, No. 24-60244, 2025 WL 1342001 (5th Cir. May 8, 2025) (noting that although a fence post is "'not a "dangerous weapon' per se" . . . .it "may become a dangerous weapon when it is wielded in a threatening manner"); United States v. Mumuni Saleh, 946 F.3d 97, 108 (2d Cir. 2019) (internal quotation marks and citations omitted) ("the question of whether an object constitutes a dangerous weapon hinges, in part, on the manner in which the object is used, as many objects, even those seemingly innocuous, may constitute dangerous weapons."); Brown v. Garmon, No. CV 16-63, 2019 WL 5209598, at *8 (W.D. Pa. Oct. 16, 2019) ("The cane, used the way defendant used it, was a deadly weapon. The natural consequence of repeatedly striking someone about the head with it is death or serious bodily injury.").

[18] In this case, the factor regarding whether multiple officers shared the same risk assessment is not relevant because Officer Van-Patten, standing between Mr. Castonguay and five bystanders, was the only officer on the scene.

\*     \*     \*

While the Court does not read Plaintiff's opposition as expressly premising any qualified immunity argument on Mr. Castonguay's "mental health struggles," [Compl. ¶¶ 31, 36, 156], the Court has nonetheless considered whether Mr. Castonguay's mental illness alters the qualified-immunity analysis. It does not. The Fourth Amendment asks whether a reasonable officer could perceive an immediate threat—not whether the suspect's behavior ultimately proved to have a medical explanation. See, e.g., Bates ex rel. Johns v. Chesterfield Cnty., 216 F.3d 367, 372 (4th Cir. 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual."); City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 617 (2015) (citing Bates with approval and applying qualified immunity in excessive-force case involving a mentally ill suspect).[19] This legal conclusion, however, does not discount the tragic reality that the loss of life here was likely, at least in part, a product of Mr. Castonguay's struggle with his mental health.

Finally, the cases on which Plaintiff relies do not counsel in favor of a different outcome. [Pl.'s Mem. at 10–18]. In Hayes v. County of San Diego, 736 F.3d 1223 (9th Cir. 2013), officers entered the decedent's home even though he had not been accused of a crime and was threatening only himself after attempting suicide. Hayes, 736 F.3d at 1227–28. When the decedent raised his hands—still holding a knife—in response to officers' commands, the officers shot him. Id. at 1228,

---

[19] See also Hassan v. City of Minneapolis, 489 F.3d 914, 919 (8th Cir. 2007) ( a suspect's "mental state does not change the fact he posed a deadly threat to the officers and the public"); Adle v. Maine Police Dep't, 279 F. Supp. 3d 337, 359 (D. Me. 2017) ("While [the suspect's] mental health condition should and did inform the police response, the fact that he might not have been capable of understanding or complying with orders to drop the knife did not make him less dangerous.").

1235. Unlike in <u>Hayes</u>, Mr. Castonguay was accused of behaving in a violent manner towards others, including threatening a neighbor with a weapon. He left his apartment and approached an officer standing nearby with bystanders present (including the neighbor he had allegedly threatened). <u>See</u> <u>supra</u> Section II. As he closed in on the officer, Mr. Castonguay held a weapon in a manner indicative of an intent to inflict harm rather than comply with a command. [Peter Duquette Aff. ¶ 10]. These factual differences likewise foreclose reliance on <u>Baker v. Goodman</u>, No. 2:19-CV-00251, 2022 WL 580471 (D. Me. Feb. 25, 2022), <u>McKenney v. Mangino</u>, 873 F.3d 75 (1st Cir. 2017), and <u>Cooper v. Sheehan</u>, 735 F.3d 153 (4th Cir. 2013).

*    *    *

For the reasons set forth above, Officer Van-Patten's use of deadly force was objectively reasonable and did not violate the Fourth Amendment. Therefore, Officer Van-Patten is entitled to qualified immunity. Accordingly, summary judgment is **<u>GRANTED</u>** as to Count I.

### B.  Count II (Deprivation of Due Process in Violation of the Fourteenth Amendment)

Plaintiff does not defend her Fourteenth Amendment claims in her opposition to summary judgment. [<u>See generally</u> Pl.'s Mem. (no mention of the Fourteenth Amendment, "due process," or Count II)]. Therefore, the Court deems Count II abandoned. <u>Montany v. Univ. of New Eng.</u>, 858 F.3d 34, 41 (1st Cir. 2017) (plaintiff's "failure to put forth any argument in [their] opposition to defendants' motion for summary judgment . . . constitutes abandonment of any such claim"); <u>Grenier v. Cyanamid Plastics, Inc.</u>, 70 F.3d 667, 678 (1st Cir. 1995) ("an issue raised in the complaint but ignored at summary judgment may be deemed waived."). Accordingly, Defendants' motion for summary judgment is **<u>GRANTED</u>** as to Count II.

### C.  Count III (Negligent Training and Supervision)

In Count III, Plaintiff asserts a Monell claim against the MPD and the Town of Milford. [Compl. ¶¶ 239–48]. As a threshold matter, municipal liability under Section 1983 requires an underlying constitutional violation. See Cox v. City of Boston, No. 22-11009-RGS, 2024 WL 4608587, at *5 (D. Mass. Oct. 29, 2024); Keller v. Town of Monson, No. 3:20-cv-30187-KAR, 2024 WL 1251420, at *13 (D. Mass. Mar. 22, 2024). Because, as discussed supra, Plaintiff has failed to demonstrate any constitutional violation, her Monell claim necessarily fails. Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Count III.

### D.  Counts IX–XIV (State Law Claims)

The remaining claims arise under state-law causes of action. [Compl. ¶¶ 283–314 (Counts IX–XIV)]. Federal district courts may decline to exercise supplemental jurisdiction over related state-law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Although this case is at an advanced stage, there have been no pretrial rulings directed at the state law claims and the Court has not invested significant judicial resources into resolving them. Therefore, in the interest of comity and in recognition that federalism favors allowing Massachusetts courts to interpret and apply their own law, the Court declines to exercise supplemental jurisdiction over the remaining claims. See Camelio v. American Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Accordingly, **Count IX** (Wrongful Death), **Count X** (Assault), **Counts XI–XII** (Negligence), **Count XIII** (Negligent Infliction of Emotional Distress), and **Count XIV** (Intentional Infliction of Emotional Distress) are **DISMISSED** without prejudice to refiling in state court.

23

## VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' motion for summary judgment as to Counts I, II, and III and the remaining state-law claims (Counts IX–XIV) are **DISMISSED** without prejudice to refiling in state court pursuant to 28 U.S.C. § 1367(c)(3).[20]


**SO ORDERED.**


Dated: March 19, 2026

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge

---

[20] See ECF No. 45 (stipulation of dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) as to Counts IV, V, VI, VII and VIII).